T. O. McCAMANT AND GRACE McCAMANT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67472, 74287. Filed June 30, 1959.

*Ben M. Davis, Esq.*, for the petitioners.
*John J. King, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax for the years and in the amounts as set forth below:

| Year | Deficiency |
|------|-----------|
| 1953 | $4,783.92 |
| 1954 | 211.76 |
| 1955 | 9,506.75 |

By amended answer respondent seeks an increased deficiency for the taxable year 1954.

The issues for decision are: (1) Whether recovery of indebtednesses previously deducted by petitioners were tax benefits constituted a taxable event where the recovery was effected by payment to the petitioners, as creditors and beneficiaries, of a portion of the proceeds of a life insurance contract on the life of the deceased debtor; (2) if so, whether that portion of the amount so recovered which was deducted by way of an addition to a Reserve-Bad Debts account, and subsequently charged off against that account as uncollectible, should be taken directly into income, or should be added back to the reserve account in the year of its recovery; (3) in the event petitioners are found to be on a reserve method of accounting for bad debts, whether the balance in that reserve for the year 1955, prior to any additions thereto, was adequate to meet expected losses; (4) whether an unidentified bank deposit constituted taxable income; (5) whether depreciation claimed on various assets was reasonable; and (6) the proper deduction for miscellaneous entertainment expenses for the years 1954 and 1955.

### FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

Throughout the taxable years 1953, 1954, and 1955, petitioners T. O. and Grace McCamant, husband and wife, resided in Abilene, Texas. They filed joint Federal income tax returns for those years with the director of internal revenue at Dallas, Texas.

At all times material hereto, petitioners were the owners of Mack's Auto Exchange, an automotive and truck agency located in Abilene, Texas, which they operated as a sole proprietorship. The books of account of Mack's were kept on an accrual basis, and were maintained in accordance with the "General Motors Dealers Standard Accounting System Manual."

The method of accounting for bad debts, and bad debt recoveries, prescribed by the General Motors manual, and utilized by Mack's, was as set forth below:

Account No. 340—RESERVE-BAD DEBTS: The balance in this account represents the amount set aside as a reserve to provide for possible losses resulting from uncollectible customer notes and accounts receivable. The balance in this account should at all times be equal to the total of customer notes and accounts receivable held by the dealer, which are 91 days or more past due.

Credit or debit this account at the end of each month with the amount necessary to bring the balance into agreement with the total of all customer notes and accounts receivable held by the dealer which are 91 or more days past due, the offsetting debit or credit being to Account 852, Provisions for bad debts.

Debit this account with the amount of all losses resulting from uncollectible customer notes and accounts receivable.

Account No. 803—BAD DEBTS RECOVERED—Credit this account with all payments received to apply on accounts or notes receivable which have previously been charged to Account 340, Reserve for Bad Debts.

Account No. 852—PROVISION FOR BAD DEBTS: Debit or credit this account at the end of each month with the amount necessary to bring the balance in Account 340, Reserve for Bad Debts, into agreement with the total of all customer notes and accounts receivable held by the dealer which are 91 or more days past due.

Conforming to the General Motors manual, petitioners, at the close of each month, made the debits or credits necessary to equalize the balance in the Reserve-Bad Debts account with the total customer notes and accounts receivable then determined to be 91 days or more past due. Offsetting debits or credits were then made to the Provision For Bad Debts account. When an account receivable or note was determined to be totally worthless, it was charged off by a debit to the Reserve-Bad Debts account.

Below are the net credits to the Reserve-Bad Debts account. Identical amounts were listed as the net debits to the Provision For Bad Debts account made by petitioners during each of the years 1950 through 1955:

| | | | |
|---|---|---|---|
| 1950 | $7,512.41 | 1953 | $6,433.48 |
| 1951 | 11,161.39 | 1954 | 3,094.41 |
| 1952 | 9,943.42 | 1955 | 5,060.56 |

On their returns for the years 1952 through 1955, petitioners deducted the net debits in the Provision for Bad Debts account for each year as a bad debt expense.

For the years 1953 through 1955, petitioners reported on their income tax returns the amounts of $588.49, $163.35, and $62.18, respectively, as recoveries on notes and accounts receivable previously charged off against the Reserve-Bad Debts account as uncollectible. Pursuant to the General Motors manual these amounts were credited to the Bad Debts Recovered account at the time of their recovery.

For at least 7 years prior to 1953, J. S. Noill was engaged in the business of purchasing farm commodities and trucking them to market for sale. In the course of that business, he used various trucks, vans, and trailers, and traveled the territory from Houston, Texas, to California. From 1946 on, petitioners sold Noill much of the automotive equipment used in that business. These sales were financed by Noill through the Yellow Manufacturing Acceptance Corporation under an agreement which required petitioners, as the dealer, to reimburse Y.M.A.C. for any loss on repossession occasioned by the purchaser's default.

In addition, petitioners extended credit to Noill for repairs, labor, parts, and other items incident to the maintenance of his equipment. An open account receivable was maintained by petitioners for the credit so extended. The following reflects that portion of Noill's account receivable which became 91 days or more overdue during the years 1950, 1951, and 1952, and which was credited to the Reserve-Bad Debts account, and debited to the Provision For Bad Debts account, in accordance with petitioners' monthly analysis:

| Date | Balance of account overdue | Portion credited to reserve account and debited to provisions account |
|------|---------------------------|-----------------------------------------------------------------------|
| Dec. 31, 1950 | $5,728.70 | $5,728.70 |
| Dec. 31, 1951 | 12,250.09 | 6,521.39 |
| July 31, 1952 | 16,051.93 | 3,801.84 |

The Noill account receivable became delinquent, and on July 31, 1952, the unpaid balance therein in the amount of $16,051.93 was charged off by a debit to the Reserve-Bad Debts account and a credit to accounts receivable.

Petitioners sustained further losses upon the repossession of two vehicles purchased from them by Noill as set forth below:

FRUEHAUF TANDEM VAN TRAILER

Repossessed 1952:
| Loss charged to cost of goods sold | $1,654.16 |
|---|---|

Sold 1953:
| Loss charged to income | 50.00 |
|---|---|

| Net loss | $1,704.16 |
|---|---|

GMC TRUCK

Repossessed 1952:
  Loss charged to cost of goods sold_____ $2,500.00
Sold 1953:
  Recovery taken into income_____ 238.00
                                                        _____
    Net loss _____ $2,212.00

During 1952, T. O. McCamant loaned Noill the sum of $1,124.25, receiving Noill's personal note in the amount of $874.25, and his personal check in the amount of $250. On Schedule D of their 1952 Federal tax return, petitioners listed as a short-term capital loss the amount of $1,024.25, which represented a portion of the McCamant loan to Noill. This loss was offset against net long-term capital gains of $1,682.71, which resulted in net gains of $658.46, of which $329.23 was reported as income.

On March 7, 1950, the Southwestern Life Insurance Company issued a policy of life insurance on the life of Noill in the stated amount of $10,000. The policy contained a family income rider which provided for the payment of benefits thereunder on the basis of the commuted value determined at the date of death. The stated commuted value of those benefits for each of the first 3 policy years was $23,680, $23,170, and $22,650, respectively. The death benefits were made payable according to the terms of the settlement agreement attached thereto, which read in part as follows:

1. The proceeds of the policy shall be paid to T. O. McCamant and the Farmers and Merchants National Bank of Abilene, Texas, Creditors, as their respective interest may appear; provided, however, that if the total of all such indebtedness shall exceed the amount payable under this policy then the proceeds of the policy shall be paid to such creditors proportionately.

2. Subject to the right of withdrawal hereinafter given, the proceeds of the policy in excess of the sum payable to such creditors shall be paid in monthly installments of $100, in accordance with Settlement Option 3 of the policy. Such installments shall be paid as they respectively become due to Lizzie Beth Noill, wife of the Insured.

Once during any calendar year the said Lizzie Beth Noill may withdraw a portion of such proceeds then unpaid, the total of all such withdrawals not to exceed $2,500.

Noill was the owner of the policy, and paid all the premiums thereon. The policy reserved to him the right to change the beneficiaries, and the right of assignment. Within 30 days after issuance of the policy, the agent who secured the policy on Noill's life called T. O. McCamant notifying him that he had been named a beneficiary thereunder. This was the first notice which McCamant had concerning the issuance of the policy.

Within 3 years after issuance of the policy, Noill ceased making premium payments. The agent informed both the Farmers & Mer-

chants National Bank and McCamant of this fact, and extended to them the opportunity of taking up the premium payments thus keeping the policy in force. Both refused to make any premium payments.

In July of 1953, Noill died. Since his death occurred within the grace period granted under the policy, and the policy had not been transferred or assigned by him during his lifetime, it was in force and operative according to the provisions hereinbefore set forth.

On July 22, 1953, Southwestern requested from T. O. McCamant, and the bank, certification of the respective indebtednesses owed them by the insured at the time of his death, and whether either or both was claiming an interest in the proceeds of the policy. On July 29, 1953, McCamant, in a letter addressed to the bank, acknowledged a contingent liability of $7,409.16 which the bank had against Noill's estate dependent upon the outcome of a suit against the bank arising out of transactions involving Noill. McCamant agreed to deposit that amount in a special account with Farmers & Merchants National in consideration for the latter's agreement to notify Southwestern that any indebtedness owed it by Noill had been paid in full, and that it was not claiming an interest in the proceeds of the policy. The bank accepted McCamant's offer, and on July 29, 1953, addressed a letter to Southwestern disclaiming any interest in the policy.

On July 30, 1953, McCamant submitted an affidavit of Noill's account to Southwestern, notifying the company that Noill was indebted to him at the time of his death in the amount of $21,092.34. The affidavit read in part as set forth below:

Statement of amounts owing to T. O. McCamant, DBA
Mack's Auto Exchange, by Jack Shannon Noill:

| | |
|---|---:|
| Balance Open Account | $16, 051. 93 |
| Loss on repossessed 1948 GMC HDCR Diesel Mtr. #4A2170 | 2, 212. 00 |
| Loss on repossessed 1950 Fruehauf Trailer, Ser. #C-27148 | 1, 704. 16 |
| Personal note to T. O. McCamant, dated May 15, 1952 | 874. 25 |
| Personal Check to T. O. McCamant, dated May 15, 1952 | 250. 00 |
| Total Indebtedness | $21, 092. 34 |

On August 7, 1953, Lizzie Beth Noill certified the indebtedness owed McCamant by her husband's estate was $21,092.34. She authorized payment of that amount to McCamant, and requested the balance of the proceeds due under the policy as provided in the settlement agreement. Southwestern's check in the amount of $21,092.34, payable to Lizzie Beth Noill and T. O. McCamant, creditor, was endorsed by them and cashed at the Farmers & Merchants National Bank on August 7, 1953. Of this amount, petitioners received $11,683.18 in 1953. They allocated $10,558.93 thereof to Noill's indebtedness to Mack's, and credited that amount to the Bad Debts Recovered account. They allocated $1,124.25 to the personal loan made to Noill by McCamant,

In 1955, they received the amount of $6,996.80, representing the remainder of the Noill insurance proceeds which, since the date of Noill's death, had been held in escrow by the bank. Petitioners included no portion of the proceeds derived from the Noill insurance contract in income in either 1953 or 1955.

The credit balance of the Reserve-Bad Debt account at the beginning and close of each of the taxable years under consideration, as well as the debits and credits made to that account during each of these years, were as set forth below:

|  | 1953 | 1954 | 1955 |
|---|---|---|---|
| Credit balance Jan. 1 | $8,883.16 | $15,316.64 | $11,942.58 |
| Debits | | (6,468.47) | (2,399.98) |
| Net credits | 6,433.48 | 3,094.41 | 5,060.56 |
| Credit balance Dec. 31 | 15,316.64 | 11,942.58 | 14,603.16 |

The amounts of notes and accounts receivable held by petitioners from 1946 through December 31, 1955, were as set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| Apr. 30, 1946 | $6,676.85 | Jan. 1, 1952 | $66,745.47 |
| Jan. 1, 1947 | 12,031.15 | Jan. 1, 1953 | 56,741.81 |
| Jan. 1, 1948 | 13,325.13 | Jan. 1, 1954 | 49,679.77 |
| Jan. 1, 1949 | 13,880.71 | Jan. 1, 1955 | 57,034.06 |
| Jan. 1, 1950 | 23,922.23 | | |
| Jan. 1, 1951 | 43,060.49 | Total | 343,097.67 |
| | | Dec. 31, 1955 | 51,231.38 |

Set forth below are the recoveries made by petitioners on those notes and accounts receivable which they had previously charged off against their Reserve-Bad Debts account as uncollectible, including an allocation of the recovery resulting from receipt of the Noill insurance proceeds, as well as the actual chargeoffs against that account made by the petitioners during the years 1946 through 1955.

| Year | Chargeoffs | Recoveries | Chargeoffs less recoveries |
|---|---|---|---|
| 1946 | | $549.83 | ($549.83) |
| 1947 | $784.19 | 9.13 | 775.06 |
| 1948 | 2,150.32 | | 2,150.32 |
| 1949 | 3,890.37 | 421.00 | 3,469.37 |
| 1950 | 3,040.43 | 119.73 | 2,920.70 |
| 1951 | 4,249.90 | 235.62 | 4,014.28 |
| 1952 | [1] 17,165.46 | 529.34 | 16,636.12 |
| 1953 | | 588.49 [2] 8,488.10 | (9,076.59) |
| 1954 | 6,468.47 | 163.35 | 6,305.12 |
| 1955 | 2,399.98 | 62.18 [2] 5,624.58 | (3,286.78) |
| Total | 40,149.12 | 16,791.35 | 23,357.77 |

[1] Includes $16,051.93 representing Noill account receivable.
[2] Recovery on Noill account of $10,558.93 in 1953, and $6,996.80 in 1955, allocated between bad debts and cost of goods sold on the basis of the amount of original Noill loss of $19,968.09 charged to each; i.e., $16,051.93 charged to bad debts, and $3,916.16 to cost of goods sold.

Respondent determined that petitioners, during 1953 and 1955, as beneficiaries of the Noill insurance contract, realized ordinary income attributable (1) to the recovery of business bad debts deducted by them in prior years; (2) to the recovery of the cost of sales items previously deducted; and (3) to the recovery of a nonbusiness bad debt to the extent of the tax benefit derived from its deduction in a prior year. He also determined that the credit balance in petitioners' Reserve-Bad Debts account as of the close of 1955, without any additions thereto, was adequate to meet expected losses, and thus disallowed the additions thereto for that year of $5,060.56.

In the alternative, respondent in an amended answer alleged that insofar as the recovery attributable to the previously deducted business bad debt was concerned, it should be credited to petitioners' Reserve-Bad Debts account in each of the years of its recovery, thereby increasing the credit balances in that account as of the close of 1953, 1954, and 1955. Based on this alternative he would disallow additions to the reserve account in the amount of $6,433.48 for the year 1953 and $2,054.62 for the year 1954.

In 1949 petitioners established a depreciation account for an item referred to as Paving, which they capitalized at $3,694.11. Up to and including 1952, they claimed, and were allowed, depreciation thereon in the total amount of $1,846.94. For each of the taxable years 1953, 1954, and 1955 they claimed a depreciation expense of $615.60 on this item. Respondent allowed the 1953 and 1954 claims, but disallowed the 1955 claim. He determined that the asset had a remaining useful life at the close of 1954 of 2 years, and therefore allowed only $307.98 of the amount claimed for the taxable year 1955.

In August of 1954, petitioners added to their depreciable assets an item referred to as a 1954 GMC wrecker capitalized at $7,097. When acquired, it had a sleeper cab on it which petitioners removed, installing a standard cab, an oil field bed, a 38 Tulsa winch and gin poles, and a rolling tailgate. The wrecker was used by them to tow trucks, buses, and cars which would not run under their own power. Petitioners assigned a 3-year life expectancy to the 1954 wrecker, and claimed, and were allowed, depreciation thereon for 1954 in the amount of $985. In 1955 they claimed depreciation thereon in the amount of $2,364. Respondent determined the 1954 wrecker, as of 1955, had a remaining useful life of 9 years, and further determined that petitioners were only entitled to depreciation thereon in the amount of $679.11 for that year. When acquired in 1954, the GMC wrecker had a useful life of 5 years, and a salvage value of $1,000.

Petitioners maintained a machinery and equipment account which reflected shop equipment acquired by them at various times having a

total cost, as of the close of 1953, of $14,725.18, which had been fully recovered by them at that time through prior years' depreciation. In 1954, an addition was made to that account of $676.29, representing the acquisition of a steam cleaner. In 1954, petitioners claimed, and were allowed, depreciation on this asset in the amount of $33.75. In 1955 petitioners made an addition to their machinery and equipment account in the amount of $351, representing the acquisition of certain electric welding equipment. In 1955 petitioners claimed machinery and equipment depreciation in the amount of $170.10. Respondent determined that petitioners' machinery and equipment had a cost basis of $15,752.47, a salvage value of $993.54, and had been fully depreciated prior to 1955. He therefore disallowed in full petitioners' deduction for that year. When acquired, both the steam cleaner and the welding equipment had a useful life of 5 years and no salvage value.

During 1954 and 1955, T. O. McCamant expended personal funds on promoting business and entertaining customers, with respect to which he kept no records. Rather, he estimated he expended for those purposes at least $10 a week. At the close of each of those years, McCamant received from Mack's a check for $500, which he treated as a reimbursement of the amount expended during the year on business promotions. Mack's deducted this amount in each such year as travel and entertainment expenses. For the year 1954, respondent allowed $300 of the expense so claimed, and disallowed entirely the deduction claimed in 1955. McCamant expended at least $300 during 1954, and $200 during 1955 for the entertainment of customers.

### OPINION.

The primary issue presented by these proceedings is whether the recoveries of the Noill account receivable, repossession losses, and loan, previously deducted as an addition to the bad debt reserve, a charge to cost of goods sold, and a nonbusiness bad debt, respectively, constitute taxable items to be taken into income in the year of their recovery in a manner consistent with petitioners' method of accounting.

The general rule is that an amount deducted from gross income in one taxable year, and subsequently recovered in another, constitutes income in the later year. *Estate of William H. Block*, and cases cited therein, 39 B.T.A. 338 (1939), affirmed subnom. *Union Trust Co. of Indianapolis* v. *Commissioner*, 111 F. 2d 60 (C.A. 7, 1940), certiorari denied 311 U.S. 658. This rule has received indirect statutory recognition in section 22(b)(12) of the 1939 Code, substantially reenacted as

section 111 of the 1954 Internal Revenue Code.[1] This section provides that, to the extent that the deduction in the earlier year did not result in a tax benefit to the taxpayer, the recovery is not includible in income. Thus, it would appear, that the recoveries here in issue are to be accounted for as income in the year received to the extent that petitioners derived a tax benefit from deductions attributable thereto in prior years.

Petitioners contend, however, that these recoveries have been expressly excluded from gross income, and exempted from taxation, by section 22 (b) (1) (A) of the 1939 Code.[2] Insofar as material here, that section provides that amounts received under a life insurance contract which were "paid by reason of the death of the insured" are to be excluded from gross income, and are exempt from tax. Petitioners' position is that the amounts received constituted life insurance paid by reason of the death of the insured, and thus are excludible from gross income under this statutory provision.

In our judgment, resolution of this controversy turns on a proper understanding of the issue before the Court. In *Durr Drug Co.* v. *United States*, 99 F. 2d 757 (C.A. 5, 1938), a case factually distinguishable from the one presently before us, an employer was owed a debt by an employee. At the instance of his employer, the employee took out insurance policies on his life naming the employer the sole beneficiary. All premiums were paid by the employer to whom the policies were delivered. Prior to 1933, the employer had charged off as worthless portions of the employee's indebtedness. The total amounts

---

[1] SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\*  \*  \*  \*  \*  \*  \*

(12) RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.—Income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount. For the purposes of this paragraph:

(A) Definition of Bad Debt.—The term "bad debt" means a debt on account of worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year.

\*  \*  \*  \*  \*  \*  \*

(D) Definition of Recovery Exclusion.—The term "recovery exclusion", with respect to a bad debt \* \* \* means the amount, determined in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, of the deductions or credits allowed, on account of such bad debt \* \* \* which did not result in a reduction of the taxpayer's tax under this chapter (not including the tax under section 102) \* \* \* reduced by the amount excludible in previous taxable years with respect to such debt \* \* \* under this paragraph.

[2] SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.

\*  \*  \*  \*  \*  \*  \*

(1) LIFE INSURANCE, ETC.—Amounts received—

(A) under a life insurance contract, paid by reason of the death of the insured ; \* \* \*

[Reliance upon section 101.(a) of the 1954 Code is misplaced. See effective date provision contained in section 101 (f) of the 1954 Code.]

charged off exceeded the face amount of the policies. Upon the employee's death in 1933, the employer collected the proceeds of the insurance. The majority of the Court of Appeals for the Fifth Circuit upheld the employer's contention that the amounts received constituted insurance proceeds paid by reason of the death of the insured, and hence were to be excluded from gross income under section 22(b) (1) of the Revenue Act of 1932 (47 Stat. 169), a section substantially similar to section 22(b)(1) of the 1939 Code. In a dissent, Judge Hutcheson, while agreeing with the majority's treatment of the question concerning whether the proceeds of the insurance contract were received by the taxpayer as a transferee of the contract or otherwise (the argument relied upon by the Government), went on to say at 99 F. 2d 760:

> I do not agree with their view that this is the sole controversy in the case. I think there is another controversy or question in the case; whether appellant did not, in the year in question, collect a debt which he had previously charged off as bad. I think he did, and that because he did, he ought to pay the tax. * * *

Here, petitioners have recovered amounts previously deducted by them from income, and thus have participated in a taxable event. In our view of the record before us, the manner in which the recovery was effected is immaterial. We therefore have concluded that the Noill recoveries are to be accounted for to the extent of the tax benefit derived in the year of their prior deduction, and in a manner consistent with petitioners' method of accounting.

Moreover, it is axiomatic that an exclusionary provision of the statute is to be strictly construed. *Commissioner* v. *Jacobson*, 336 U.S. 28 (1949). Thus, not only must petitioners establish that the amounts were received under a contract of insurance, but also they must further show that such amounts were "paid by reason of the death of the insured."

The insurance policy taken out by the debtor in this case was taken out voluntarily and not at the instance of the creditor. The debtor's intent obviously was to provide funds with which his creditors would be paid. The death benefits provided by the policy were made payable to "T. O. McCamant and the Farmers and Merchants National Bank of Abilene, Texas, *Creditors, as their respective interests may appear* * * * [emphasis supplied]," with a provision for allocation should the total indebtednesses exceed the amount payable under the policy, and with a further provision for payment of the benefits in excess of any indebtednesses to the insured's wife. It is therefore apparent that before McCamant could take under the provisions of the insurance contract, he not only had to establish Noill's death, but also had to prove that at the time of death, Noill was indebted to him. Without proof of this indebtedness, McCamant was entitled to no part of the benefits provided for by the contract. Thus, the amounts re-

ceived by petitioners under the Noill insurance contract were not "paid by reason of the *death* of the insured," albeit his death was a prerequisite to the fund coming into existence. Rather, the funds were paid to petitioners by reason of the *indebtedness* of the insured to them. This is not the case of a creditor who has been named the sole beneficiary of a contract of insurance on his debtor's life and is the owner of such policy and its proceeds regardless of the existence of indebtedness at the time of death. That was the situation presented to the Fifth Circuit in *Durr Drug Co.* v. *United States, supra,* strongly relied on by petitioners. In that case, however, the beneficiary had only to submit proof of death to the insurer in order to be entitled to the benefits of the contract. In the case before us—no debt, no payment. This distinction between *Durr* and the instant case is vital.

Since petitioners have not brought themselves squarely within the exclusionary provisions of section 22(b)(1)(A) of the 1939 Code, that section is not here applicable, and the general rule, relative to the recovery of items previously deducted with tax benefits, is operative in the manner noted above.

The parties apparently are in agreement, should it be held that the recoveries here in issue constitute taxable income, that the portions thereof attributable to the repossession losses and the personal loan are to be taken directly into income in 1953 to the extent of the tax benefit derived in the years of their prior deduction. A minor issue with respect to the amount of the tax benefit derived from the deduction of the personal loan has been conceded by respondent.

There remains for resolution, however, the manner in which the recovery of the Noill account receivable is to be accounted for by the petitioners. Respondent determined that the amounts attributable thereto which were recovered during 1953 and 1955, i.e., $8,488.10 and $5,624.58, respectively, should be taken directly into income in these years. Petitioners, on the other hand, contend that those recoveries should in each year be credited to their reserve account.

The record indicates that during 1953, 1954, and 1955, and presumably during prior years, petitioners consistently took into income recoveries of specific accounts previously charged off against their Reserve-Bad Debts account as uncollectible, notwithstanding the fact that the deduction attributable thereto had been taken by way of an addition to that account based upon an analysis of accounts 91 days or more past due. In light of this fact, we are of the opinion that the instant recoveries should also be taken directly into income in the year of receipt, so as to accord with the method of accounting regularly employed by petitioners, as prescribed by section 41 of the 1939 Code and section 446(a) of the 1954 Code. *Boyd-Richardson Co.,* 5 T.C. 695 (1945); *J. F. Johnson Lumber Co.,* 3 T.C. 1160 (1944); *Ohio Loan & Discount Co.,* 3 T.C. 849 (1944). The material factor in those cases

is consistency, and not whether the method of accounting is a reserve or direct chargeoff method. Accordingly, the amounts of $8,488.10 and $5,624.58, recovered in 1953 and 1955, respectively, constituted ordinary income to petitioners in each of those years.

The next issue relates to respondent's determination that the balance in petitioners' bad debt reserve for 1955, prior to any additions, was adequate to meet expected losses, and his consequent disallowance of the $5,060.56 addition made to the reserve in that year. Necessarily, a consideration of this issue presupposes petitioners utilized a reserve method of accounting for bad debts.

At all times material hereto, petitioners had available to them the statutory privilege of claiming deductions in computing their income for accounts that became worthless. This they were entitled to do on one of two methods; the direct chargeoff method or the reserve method. The direct chargeoff method contemplates the chargeoff and deduction from income of specific accounts which have in fact become totally or partially worthless during a particular taxable year. On the other hand, the reserve method permits a taxpayer to estimate, on the basis of past experience, what percentage of his receivables will become worthless, and then to create a reserve covering such estimated losses; the deduction in any year being equivalent to the net addition to that reserve necessary to maintain its balance at a level adequate to meet expected losses. No chargeoffs of specific accounts are made until that time when the account has become worthless. Then the account is removed from the accounts receivable ledger and charged against the reserve, thereby reducing it by that amount. However, no deduction from income is taken at this time, since it has been effected by virtue of a prior credit to the reserve.

Petitioners' method of accounting for bad debts was somewhat irregular in that it combined certain features of both a reserve and a direct chargeoff system. Rather than utilizing an estimated percentage of outstanding accounts as the criterion for the credit balance in their reserve, petitioners maintained as a standard the total of accounts 91 days or more past due. While this necessarily involved an analysis of all outstanding accounts, the addition to the reserve was not predicated on actual worthlessness. When a specific account in fact became worthless, it was removed from both the accounts receivable ledger and the reserve by a chargeoff, but was not deducted from income, the deduction having been accomplished through the prior addition to the reserve. In the light of the general description of the two methods of bad debt accounting set forth above, we have concluded that petitioners were essentially on the reserve method. See *O. P. Lutz*, 29 T.C. 469 (1957).

A review of petitioners' actual bad debt experience over the period extending from April of 1946 through December of 1955 reveals total

accounts receivable of $394,329.05, and net losses attributable thereto in the amount of $23,357.77, taking into account the Noill recoveries, producing a bad debt experience factor of approximately 6 per cent. As of the close of 1955, petitioners had outstanding notes and accounts receivable in the amount of $51,231.38, and maintained a credit balance in their reserve account, prior to any additions thereto, of $9,542.60, for a ratio of 18.62 per cent. Thus, when judged in the light of their past experience, the balance in petitioners' reserve at the close of 1955 was more than adequate to meet expected losses prior to any addition. Under these circumstances, it is clear that respondent, by disallowing the addition to the reserve in 1955, did not abuse the discretion vested in him by section 166(c) of the 1954 Code.[3] Accordingly, the disallowance is sustained.

That petitioners have regularly used the same formula over the years in determining the additions to be made to their reserve account is immaterial, since a method which has produced a reasonable result in one or more years may very well produce an unreasonable result in the year under consideration. *Black Motor Co.*, 41 B.T.A. 300 (1940), affd. 125 F. 2d 977 (C.A. 6, 1942).

Respondent determined that petitioners realized income of $40 in 1953 with respect to an unidentified bank deposit in that amount made on July 3, 1953. On brief petitioners admit they are unaware of either the source or the nature of the deposit. In the absence of evidence on this issue, petitioners have failed to carry their burden of proving respondent's determination incorrect, and it therefore is sustained.

The next issue concerns the proper allowance for depreciation on certain assets used by petitioners in their business. In 1949 petitioners established a depreciation account for an item referred to as Paving which they capitalized at $3,694.11. Through 1952 they claimed, and were allowed, depreciation thereon in the amount of $1,846.94. During each of the years 1953 through 1955 they claimed depreciation thereon in the amount of $615.60. Respondent allowed the 1953 and 1954 claims, but disallowed $307.62 of the 1955 claim, determining that at the close of 1954 the asset had a remaining useful life of 2 years. Recognizing that they are not thereby deprived of the benefit of the full deduction, petitioners argue that to sustain the determination will work a hardship on their accountant, since he will be forced to make adjustments to the schedules already in use. While this may be the case, in the absence of any evidence establishing error in respondent's determination it must be sustained.

---

[3] SEC. 166. BAD DEBTS.

(c) Reserve For Bad Debts.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

In August of 1954, petitioners acquired a GMC wrecker which they capitalized at $7,097. They assigned a 3-year life expectancy to this asset, and claimed, and were allowed, depreciation thereon in 1954 in the amount of $985. Of the $2,364 depreciation expense claimed by them on the wrecker in 1955, respondent allowed only $679.11, determining that as of that time the asset had a remaining useful life of 9 years. On brief, petitioners contend that the wrecker had a useful life of from 3 to 5 years, and a salvage value of from $750 to $800. Respondent on the other hand maintains the asset had a useful life of 10 years, and no salvage value. The question is one of fact, and has been disposed of by our finding that the 1954 wrecker when acquired had a useful life of 5 years, and a salvage value of $1,000.

Petitioners' shop equipment account, at the close of 1953, reflected a cost basis of $14,725.18, all of which had been recovered through prior depreciation. During 1954 and 1955, respectively, petitioners acquired a steam cleaner at a cost of $676.29 and welding equipment at a cost of $351. Petitioners' claim of depreciation on the cleaner in the amount of $33.75 was allowed in 1954, thus resulting in an unrecovered cost of their shop equipment at the beginning of 1955 in the amount of $993.54. Respondent determined petitioners' shop equipment had a total cost basis of $15,752.47 of which $14,758.93 had been recovered through depreciation prior to 1955, and that the remainder of that cost, $993.54, represented salvage value of such equipment. It is apparent that respondent has treated the unrecovered cost of the steam cleaner and welding equipment as the salvage value attributable to all the assets contained in petitioners' shop equipment account. On the basis of the testimony of petitioners' accountant who was familiar with these two items of equipment, and on the basis of the record as a whole, we have found as a fact that when acquired, both the steam cleaner and the welding equipment had a useful life of 5 years and no salvage value. Therefore, an appropriate adjustment must be made to respondent's disallowance of the depreciation deduction claimed by petitioners on their shop equipment in 1955.

On brief petitioners contend that respondent assigned "unrealistic salvage values" to other items of automotive equipment, but have introduced no evidence on this point. Accordingly, respondent's determination is sustained.

The final issue relates to the 1954 and 1955 deductions taken by Mack's for alleged reimbursements made to McCamant for personal funds expended by him in promoting business. McCamant testified that it was his practice to make certain out-of-pocket expenditures for the entertainment of customers; that he kept no records with respect thereto, but rather estimated that they were in excess of $10 per week during 1954 and 1955. At the close of each such year, Mack's issued a check to McCamant in the amount of $500, which it

claimed as a reimbursement of these expenditures. Respondent disallowed $200 of the 1954 deduction, and all of that claimed in 1955. Based on an extremely vague and inconclusive record as to this point, we have found that McCamant expended at least $300 during 1954 and $200 during 1955 for the entertainment of customers. Accordingly, respondent's determination on this issue for 1954 is sustained. An appropriate adjustment must be made with respect to his 1955 determination.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*