J. Ballay & Company, Inc. v. Commissioner.
J. Ballay & Co. v. Commissioner
Docket No. 78687.
United States Tax Court
T.C. Memo 1961-169; 1961 Tax Ct. Memo LEXIS 180; 20 T.C.M. (CCH) 868; T.C.M. (RIA) 61169; June 12, 1961
Martin M. Lore, Esq., 107 William St., New York, N. Y., for the petitioner. Theodore E. Davis, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in income tax of petitioner in the amount of $31,820.87 for the year 1955. The sole issue is whether the amount of $61,193.99, added by petitioner to its reserve for bad debts on December 31, 1955, constituted a reasonable addition to the reserve deductible under Section 166(c) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by reference. Petitioner, a New York corporation, filed its corporation income tax return for 1955 with the district director of internal *181 revenue for the Lower Manhattan District of New York. Petitioner has been engaged in commercial financing and factoring since the year 1940. Its business consists primarily of making short terms loans, of no longer duration than one year, at rates of interest varying between 12 percent and 16 percent. Such loans are made to firms which could not borrow from banks. Obligations are often renewed and revolving credit extended. Petitioner receives some kind of security for virtually all of its loans. Accounts receivable assigned as collateral are relatively easy to collect as long as petitioner's debtor remains in business, but where the debtor goes out of business petitioner has experienced difficulty in collecting in some instances. Its loans are made "mainly" to corporations engaged in export business. Some loans are made to firms located in foreign countries - mostly in South America. Petitioner's experience has shown that greater risks are involved in foreign than in domestic loans. Petitioner has at all times maintained a reserve for bad debts, as authorized by Section 166(c) of the Internal Revenue Code of 1954 and predecessor provisions of the internal *182 revenue laws. As of December 31, 1955, its board of directors considered the status of the loans and advances then outstanding and what provision, if any, should be made for an addition to its bad debt reserve to take care of possible losses. Out of 52 accounts, the board had some "apprehensions" about the following accounts: Gary Scott Commodities Corporation, Bara Corporation, B. & J. Drug, Inc., Citation Cards, Inc., Kennitz & O'Brien, Lone Star Metals, Marliss Products Corp., Mars Export and Import Co., One World Export & Import Corporation, Queen Mode Plastic Corp., United Service Export Corp., Zinvar Corp., Viking Export Corp. Petitioner and other lenders had made a series of some 20 loans to Gary Scott Commodities Corporation that were outstanding in the aggregate amount of $505,000 on December 21, 1955. Petitioner's participation in these loans amounted to $265,000. Gary Scott Commodities Corporation had acquired a large number of surplus hosiery knitting machines in the United States, and sold them to purchasers in Germany, France and Italy. Petitioner's board of directors had some misgivings about these loans because of their size and lack of diversification, and because *183 it "feared" that the foreign purchasers would not all live up to their obligations. Gary Scott, as well as the purchasers, was liable for the payment of the $505,000 loans. These loans have been paid in full, although similar loans made in later years in the aggregate amount of $80,000 have not yet been repaid. The loan to the Bara Corporation, an exporter of pharmaceuticals, amounted to $1,030 on December 31, 1955, and was secured by drafts. The purchaser in Iran did not take over the merchandise "which perished or got bad because of the hot climate" and the Bara Corporation went out of business. The $1,030 was uncollectible and petitioner charged it off in 1956. B. & J. Drug, Inc., owed $4,270 on December 31, 1955. This loan was secured by accounts receivable, but there were "some irregularities" in the collateral. The $4,270 was repaid in full. The loan to Citation Cards, Inc. amounted to $20,050 on December 31, 1955. This concern was owned by a commercial artist who "invented" modern-type large greeting cards. As a novelty, his business was a great success. The business was sold after he lost his capital in other ventures. Petitioner collected the entire amount of the $20,050 *184 loan. Kennitz & O'Brien owed petitioner $74,361 on December 31, 1955. Petitioner's officers received in the latter part of 1955 "unfavorable information" about this concern and used "strong pressure" to get it to reduce its account. The entire amount owed by Kennitz & O'Brien was collected by petitioner in 1956. The borrower at some unspecified time thereafter went into bankruptcy. Lone Star Metals owed petitioner $38,032 on December 31, 1955. The owner of the stock of this corporation, unfortunately from petitioner's point of view, had interests in various other enterprises and was very often out of the country. He was absent for a long period in 1955, and petitioner felt that the men he left in charge "were not up to it". Petitioner collected the entire amount of this loan. Marliss Products Corporation owed petitioner $10,341 on December 31, 1955. On that date petitioner had "doubts and fears" with respect to this account, but nevertheless made additional loans after 1955 to this corporation. Petitioner collected the entire amount of the $10,341 loan but sustained a loss of $20,000 on the additional loans made after 1955. Mars Export and Import Co. owed petitioner $25,451 *185 on December 31, 1955. This company was a dealer in imported glass pearls and costume jewelry. Merchandise sold by it was rejected. It went out of business in the early part of 1956 and the greater part of the collateral turned out to be nonexistent. $4,000 was ultimately collected by petitioner on this loan. About $18,000 was written off in 1956. Petitioner hoped to collect the remaining amount of some $2,000 from "the owner" but has not been successful thus far. "He" went into bankruptcy in 1961. One World Export & Import Corp. owed petitioner $20,846 on December 31, 1955. This corporation exported mainly to the Belgian Congo where the man who "owned" it had relatives and friends and the amounts owed for merchandise were regularly paid. But "he was himself either from Turkey or Syria, and Turkey had an exhibition in the United States" and he was persuaded to buy a lot of merchandise which was left over and "lost all his capital" in this transaction. As of December 31, 1955, petitioner was "apprehensive" about this account, but it was successful in collecting the entire amount of the $20,846 loan. Queen Mode Plastic Corporation owed petitioner $31,075 on December 31, 1955. Petitioner *186 knew that the product made by this corporation, a plastic raincoat, "did not succeed because the material was not good" and there had been a "great many complaints" and rejections. In 1956 its assets were assigned to the New York Credit Adjustment Bureau and it went out of business. Petitioner had a "prolonged fight" with the Bureau "to ascertain the accounts receivable", the collateral which had been assigned to petitioner. The entire amount of the $31,075 loan was collected by petitioner. United Service Export Corporation owed petitioner $54,035 on December 31, 1955. This corporation was controlled by two brothers, natives of Iran, who lived in the United States and exported from the United States to Iran. After petitioner started to do business with them, it learned that most of their customers were relatives. At the end of 1955, petitioner's officers had some "apprehensions" about this loan. However, petitioner collected the entire amount of the $54,035 loan. It made additional loans to the United Service Export Corporation after 1955 and eventually lost $36,000 with respect to such subsequent loans. Zinvar Corporation owed petitioner $42,929 on December 31, 1955. Petitioner *187 discontinued further loans because of apprehensions with respect to the account. In 1956 petitioner collected the entire amount of the $42,929 loan; Zinvar Corporation thereafter went out of business. The Viking Export Corporation owed petitioner $27,201 on December 31, 1955. "There were at that time no difficulties, but we had reduced the business which was over $50,000 to the amount of $27,000, and decided to reduce as much as possible." The borrower at some unspecified time thereafter "went out of business", but the entire amount of the $27,201 loan was collected by petitioner. Petitioner's board of directors decided to add $61,193.99 to petitioner's reserve for bad debts as of December 31, 1955. The amounted added was computed as follows: Loans to customers
$3,539,358.53
Accrued interest and commissions
77,231.91
Total
$3,616,590.44
Less: Participation
$ 790,522.05
Accrued interest due on participation
11,563.00
802,085.05
Accounts receivable per return
$2,814,505.39
Letters of Credit issued
1,932,404.96
Letters of Acceptance
24,400.00
Total advances
$4,771,310.35
Reserve - 3%
143,139.31
Reserve 1/1/55
$90,787.74
Charges against reserve
8,842.42
81,945.32
Addition to reserve
$ 61,193.99
*188 The amounts reflected above for letters of credit and acceptance did not constitute accounts receivable or advances made to customers at December 31, 1955, because as of that time deliveries had not been made to petitioner's customers. Petitioner's loans and advances, loans and advances plus letters of credit, balance of reserve, actual bad debt losses, and additions to reserve for 1950 through 1959 were as follows: Loans and
Advances
Actual Bad
Loans and
Plus Letters
Balance
Debt Losses
Additions
Dec. 31
Advances
of Credit
of Reserve
During Year
to Reserve
1950
$ 999,855.56
$ 999,855.56
$ 19,997.11
$12,800.00
$17,380.51
1951
732,181.41
732,181.41
21,965.44
55,238.00
57,206.43
1952
1,070,660.92
1,070,660.92
65,420.47
10,407.79
53,862.82
1953
1,006,923.47
1,006,923.47
61,842.92
6,383.77
3,184.21
1954
2,222,289.24
2,508,844.61
90,787.74
377.99
28,944.73
1955
2,814,505.39
4,771,310.35
143,139.31
8,842.42
61,193.99
1956
3,946,773.83
4,912,222.65
147,366.68
30,000.00
34,227.37
1957
3,922,773.39
4,836,103.56
143,942.10
38,033.65
34,609.07
1958
3,587,961.11
4,025,025.45
117,998.18
61,152.79
65,808.87
1959
3,896,869.04
4,335,634.49
194,497.41
19,054.02
95,553.25
*189 The breakdown of the actual bad debt losses for the years 1956 to 1959, inclusive, is as follows: 1956
1957
1958
1959
Atpac
$ 9,439.46
Bara
1,024.18
Columbia A & S
465.00
$ 465.39
Ramte (Studebaker)
986.04
1,045.97
Mars
18,085.32
470.00
$30,000.00
United Service Export
36,052.29
$38,033.65
Dannemann
$ 403.57
Master Canvaser
749.22
Ocean Trading Corp.
60,000.00
$10,000.00
Picaser & Hermanos
$61,152.79
181.90
Automotora Vergara
769.33
Six Nations Corp.
5,000.00
Suzette Bags, Inc.
761.08
Professional Clean-It Corp.
900.00
Standard American Export
1,441.71
$19,054.02
For the year 1960, petitioner's bad debt losses amounted to approximately $400,000. On petitioner's income tax return for the year 1955, pursuant to the decision of its board of directors, it deducted $61,193.99 as its addition to its bad debt reserve. The Commissioner explained his disallowance of the deduction as follows: (a) Deduction for bad debts claimed on your return in the amount of $61,193.99 representing an addition to a reserve for bad debts is held to be unreasonable in view *190 of the ample balance of the reserve account. Therefore, the deduction is disallowed in accordance with the provisions of section 166(c) of the Internal Revenue Code of 1954. Opinion RAUM, Judge: Section 166(c) of the Internal Revenue Code of 1954 permits the deduction of (in the discretion of the Secretary or his delegate) a reasonable addition to a reserve for bad debts. Congress has thus made the deduction contingent upon the discretion of the Commissioner (the Secretary's delegate), and in order to prevail it was incumbent upon the petitioner to prove that the disallowance of the deduction it claimed for an addition to its bad debt reserve was an abuse of that discretion. See Krim-Ko Corporation, 16 T.C. 31, 37. Petitioner has sought to discharge that burden by presenting evidence calculated to establish the shaky character of 13 loans outstanding as of December 31, 1955, and thereby to justify the addition of $61,193.99 to the existing reserve of $81,945.32. We are not persuaded by that evidence that the Commissioner erred in disallowing the deduction for the addition to the reserve. Notwithstanding some general *191 testimony suggesting otherwise, we are not convinced that the loans outstanding as of the end of 1955 were different in character or quality from the loans made in prior years by petitioner. And petitioner's actual bad debt experience in the prior years is shown by the following table: Outstanding Loans
Bad Debt
Year
at December 31
Losses
1950
$ 999,855.56
$12,800.00
1951
732,181.41
55,238.10
1952
1,070,660.92
10,407.79
1953
1,006,923.47
6,383.77
1954
2,222,289.24
377.99
1955
2,814,505.39
8,842.42
$8,846,415.99
$94,050.07
Petitioner's accounts receivable at the end of 1955 were $2,814,505.39, and, considering the fact that virtually all of its loans were short term, less than a year, we think it quite plain that the Commissioner was fully justified in treating the existing reserve of $81,945.32 as being ample without being further augmented. Cf. T. O. McCamant, 32 T.C. 824, 837; Krim-Ko Corporation, supra, 16 T.C. at pp. 37-38. The testimony as to each of the 13 loans was marked by considerable generality, and words of such variable content as "fears", "apprehensions", "concern", and the like, as applied *192 to the loans in question, hardly establish, even in the context of the entire record, sufficient basis to hold that the Commissioner has abused his discretion. To the contrary, of the 13 loans, only two of them in fact became uncollectible, and petitioner lost an aggregate of some $21,000, or $22,000 in connection therewith. Yet its reserve for bad debts as of the end of 1955 was nearly four times that amount without any addition whatever. To be sure petitioner has pointed out that it lost about $400,000 in 1960. But such losses did not relate to any loans outstanding at the end of 1955, cf. West Virginia Steel Corporation, 34 T.C. 851, 859; nor is it clear from the evidence that the loans in question, the bulk of them involving maritime loans with respect to tankers, were fairly comparable to the loans outstanding as of the end of 1955. We think the Commissioner did not commit error. Decision will be entered for the respondent.