Arthur J. Gray and Esther Gray, Petitioners v.
Commissioner of Internal Revenue, Respondent

Docket No. 5402–77.    Filed October 30, 1978.

*James R. Mayo,* for the petitioners.
*Gordon W. Cook,* for the respondent.

Quealy, *Judge:* Respondent determined a deficiency of
$13,733 in petitioners' Federal income taxes for the 1973
calendar taxable year. Because of the concessions made by the
parties, the only issue remaining for decision is whether
payments received by petitioners upon the termination of
certain lease and management contracts shall be considered as
amounts received in an exchange for such leases within the
meaning of section 1241.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of
facts and the exhibits attached thereto are incorporated herein
by this reference.

Arthur J. Gray (hereinafter referred to as petitioner) and
Esther Gray, who are husband and wife, filed a joint Federal
income tax return for the taxable year 1973. At the time of the
filing of the petition herein, they resided in Fort Bragg, Calif.

In the taxable year 1971, the Gray Joint Venture (hereinafter
referred to as the partnership) in which petitioner had a 90-

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as
amended.

percent interest entered into separate lease and management agreements with U. S. Hertz, Inc., pursuant to which the partnership would lease and Hertz would manage an almond orchard for a stated annual rental of $10,000 and a management fee of $10,000, or a total of 90 percent of the value of the crops, whichever was the lesser. Pursuant to the terms of such agreements, the partnership was required to pay Hertz in the first year of the lease the sum of $10,000 as advance rents under the lease and the sum of $10,000 as advance fees under the management contract. The advance payments were deducted in the partnership return for the taxable year 1971. The partnership did not acquire any interest in the growing crops for that year, and insofar as this record shows, received no income from the almond orchard in the taxable year 1971.

For the taxable year 1972, the partnership reported farm income of $1,073 on account of the almond orchard, computed as follows:

| | | |
|---|---|---:|
| Sales of fruits and nuts | | $21,172 |
| Less: Rent | $10,000 | |
| Management fee | 10,000 | |
| Legal and accounting | 96 | |
| Other | 3 | |
| | | 20,099 |
| Net farm profit | | 1,073 |

In the taxable year 1972, the petitioner entered into identical lease and management contracts with U. S. Hertz, Inc., pursuant to which petitioners would lease and Hertz would manage, each pursuant to separate agreements, two additional almond orchards. The designation of properties to be leased and managed, and the advance rentals and management fees to be paid on account thereof for the taxable year 1972, were, as follows:

| Contract | Orchard | Amount |
|---|---|---:|
| Lease | Ballard 21 2/3 acres | $10,000 |
| Management | Ballard 21 2/3 acres | 10,000 |
| Lease | Fishman 40 acres | 15,000 |
| Management | Fishman 40 acres | 15,000 |

Such payments were deducted in petitioners' income tax return for the taxable year 1972. The petitioner did not acquire

any interest in the growing crops for that taxable year, and insofar as this record shows, received no income from the leases in that year.

The prepayment of the so-called rents and management fees by the partnership and by the petitioner pursuant to the contracts with U. S. Hertz, Inc., as reflected in petitioners' returns, reduced taxable income in the following amounts:

|  | 1971 | 1972 |
|---|---|---|
| Partnership (90%) | $18,000 | |
| Ballard lease | | $20,000 |
| Fishman lease | | 30,000 |
| Totals | 18,000 | 50,000 |

The leases from U. S. Hertz, Inc., and the accompanying management contracts each provided for an initial term of 15 years with the right of the lessee to renew for an additional term of 15 years, subject, however, to the right of the lessee by notice to terminate the lease and management contracts as of the end of the third year and up until the end of the eighth year. In the event of the election of the lessee to terminate, U. S. Hertz, Inc., was required to refund or repay to the lessee the rent and management fees paid in advance for the first year of the contracts.

In the taxable year 1973, U. S. Hertz, Inc., set about to terminate their outstanding lease and management contracts covering these and similar orchards.[2] The following notice was transmitted by U. S. Hertz, Inc., to its lessees:

U.S.-HERTZ, INC., as the owner of the fee simple interest in the orchard, has received an attractive offer to sell the orchard property, including all proceeds from the current crops, on terms that will permit us to have all of the leasehold interests taken out at the same time.

As you know, your Lease and Management Agreements have several years yet to run, subject to your option right to terminate both agreements at any time after the third year and up until the end of the eighth year and receive back an amount equal to your entire first-year payment.

In light of the bid which the Company has now received, it is prepared to permit all of the lessees of the orchard property to accelerate this option right. If you agree, the Company will remit to you the full amount of your initial payment in cash in full satisfaction for the termination of your Lease and

---

[2] On July 19, 1973, the California Department of Corporations issued an order requiring U. S. Hertz, Inc., to desist and refrain from the further sale of such contracts. Whether this order or financial losses were the reason for the termination of the contracts in question is immaterial.

Management Agreements, effective as of the closing date of the Company's sale of its fee interest in the property. To facilitate its processing it is anticipated that a check for the full amount due you will be mailed by the Company within sixty days after the closing date.

The closing date has been set for less than one month from the date of this letter. It is therefore essential that the Company receive your response as soon as possible. If you agree to the foregoing, please sign the enclosed copy of this letter in the space provided below and return it to U.S.-HERTZ, INC. in the return envelope. You will receive prompt notification once the sale of the property has closed, and your check will be forthcoming within the time specified.

No oral statements or discussions shall be binding or commit the Company. If any further information relative to the sale of the orchard property and the cancellation of the leases is deemed desirable, please direct your inquiry in writing to the Company.

In response to this offer, on December 27, 1973, petitioner and the partnership signified their acceptance to the termination of their lease and management contracts with Hertz.

In the taxable year 1973, U. S. Hertz, Inc., thereupon paid the partnership the sum of $20,000, together with $2,000 denominated "interest" for the cancellation of its lease and management contract. At the same time, Hertz also paid petitioner $50,000, together with $5,000 denominated "interest" for the cancellation of petitioner's contracts.[3]

In petitioners' return for the taxable year 1973, petitioner's allocable share of the payment to the partnership ($18,000) and the sum of $50,000 paid to petitioner on account of the cancellation of the lease and management contracts were reported as gain realized from the sale or exchange of a capital asset.

In the notice of deficiency, respondent determined that the amount received from U. S. Hertz, Inc., in the taxable year 1973 constituted payment for "growing crops" and was an asset which was not a capital asset under section 1231. Accordingly, respondent determined that the resulting gain was taxable as ordinary income. In the submission of the case to the Court, the respondent would sustain that determination on the basis of the

---

[3]The proposal sent out by U. S. Hertz, Inc., and purportedly accepted by petitioner, does not provide for interest. The petitioner's return for the taxable year 1973 does not reflect any income attributable to the sale of the crops in that year. Presumably, interest was paid in lieu thereof, effecting a cancellation as of Dec. 31, 1972. However, petitioner testified that there were no negotiations other than acceptance of the proposal.

so-called "tax benefit rule," thus departing from the grounds stated in the notice of deficiency.

## OPINION

The petitioner, individually, and as a partner in the Gray Joint Venture, entered into a series of agreements with U. S. Hertz, Inc., for the leasing of certain almond groves, coupled with an agreement whereby the properties leased would be managed by the lessor. The lease and management contracts required the prepayment of rentals and management fees for the first year of the contract, during which petitioner would receive no income. The contracts were to run for a term of 15 years with the right of the petitioner to renew for an additional term. However, petitioner had the option to terminate the contracts after the third year and before the ninth year, whereupon the amounts prepaid would be refunded or repaid to the petitioner.

U. S. Hertz, Inc., offered to accelerate the termination procedure. Petitioner accepted, whereupon the contracts were terminated and there were refunded to the petitioner in the taxable year 1973 the advance rent and management fees paid in the first year of the contracts. Such amounts had initially been deducted in the years paid.

The petitioner contends that the repayment of the advance rentals and management fees upon the premature termination of the contracts constituted gain from the sale or exchange of a capital asset under the provisions of section 1241. That section provides:

SEC. 1241. CANCELLATION OF LEASE OR DISTRIBUTOR'S AGREEMENT.

Amounts received by a lessee for the cancellation of a lease, or by a distributor of goods for the cancellation of a distributor's agreement (if the distributor has a substantial capital investment in the distributorship), shall be considered as amounts received in exchange for such lease or agreement.

Petitioner argues that both the lease and management contracts gave rise, in substance, to a single leasehold interest and that the gain realized upon the repayment of both the advance rental and management fees is taxable as a payment on account of the cancellation of a lease under the foregoing statute.

The respondent would treat the lease and management contracts separately. Respondent contends that the manage-

ment contracts are not "leases" and do not come within the scope of section 1241.

With respect to the leases, respondent relies on section 1.1241–1(b), Income Tax Regs., which defines the term "cancellation" in section 1241, as follows:

(b) *Definition of "cancellation."* The term "cancellation" of a lease or a distributor's agreement, as used in section 1241, means a termination of all the contractual rights of a lessee or distributor with respect to particular premises or a particular distributorship, other than by the expiration of the lease or agreement in accordance with its terms. * * *

Respondent contends that the leases were terminated in accordance with their terms, and therefore the payments were not received for the cancellation of the lease. Respondent would tax the payments as ordinary income under the so-called "tax benefit rule" as the recovery of prior years' deductions.

The parties have stipulated that the petitioner acquired a leasehold interest in the groves. The Court need not consider that question. See *Kingsbury v. Commissioner,* 65 T.C. 1068 (1976). Nor do the parties question the deductibility of the advance payments in the first instance. For purposes of decision, the Court will assume that the deductions were allowable in the years claimed. See *Canelo v. Commissioner,* 53 T.C. 217 (1969). The only question remaining is whether the payments received by the petitioner and the partnership constituted the payment for a cancellation of a leasehold interest under section 1241 and, if so, whether the tax benefit rule takes precedent over the provisions of that section.

With respect to the management contracts, petitioner's claim that such contracts should be treated as part of the leasehold interest is wholly lacking in merit. While it is true that the management contracts could not survive the cancellation of the leases, this does not qualify such contracts as "leases" within the meaning of section 1241. There is simply no basis in fact for the petitioner's argument.

The same might be said for the respondent's argument that the leases were terminated in accordance with their terms within the meaning of section 1.1241–1(b), Income Tax Regs. The leases did not provide for termination prior to the expiration of the third year. The petitioners were repaid, not only the initial advance rents and management fees for the first year of the contracts, but in addition a premium of 10 percent designated as

"interest." Nothing in the contracts provides for this premium. The acceleration of the termination provisions provided for in the leases was not in accordance with the terms of such leases, but by agreement between the petitioner and the lessor.

The problem with the petitioner's argument is that the amounts received were not in consideration for the cancellation itself, but represented the repayment of amounts previously deducted together with interest on such payments presumably to reflect the fact that neither the petitioner nor the partnership participated in the crops for the year 1973.

Petitioner's counsel contends that the petitioner should not be penalized on account of his failure to obtain the services of an attorney in negotiating the premature termination of these contracts. Petitioner testified that there were no negotiations. Such testimony is obviously incorrect since the petitioner was paid not only the amounts set forth in the notice which the petitioner signed, but in addition an amount designated as interest. Likewise, the returns for the year 1973 show that neither the partnership nor the petitioner participated in the crops for that year.[4]

Accordingly, it is our opinion that the amounts in dispute were not paid for the cancellation of the contracts, but constituted the repayment of advance rentals and management fees previously deducted by the petitioner for which a tax benefit was realized. Section 1241 is inapplicable to such payments. The repayment of such amounts pursuant to agreement of the parties is taxable as ordinary income. *National Bank of Commerce of Seattle v. Commissioner*, 115 F.2d 875 (9th Cir. 1940), affg. 40 B.T.A. 72 (1939); *McCamant v. Commissioner*, 32 T.C. 824 (1959). However, even if there was a payment in cancellation within the meaning of section 1241, the tax benefit rule would take precedent. See *Spitalny v. United States*, 430 F.2d 195 (9th Cir. 1970); *Commissioner v. Anders*, 414 F.2d 1283 (10th Cir. 1969), revg. 48 T.C. 815 (1967); and *Merchants National Bank of Mobile v. Commissioner*, 199 F.2d 657 (5th Cir. 1952), affg. 14 T.C. 1375 (1950).

*Decision will be entered under Rule 155 .*

---

[4]The Court is not impressed by the claim that petitioner was not sophisticated in these matters. In petitioner's return for the year 1973, there was deducted a net loss from "partnership," i.e., tax shelters, totaling $159,235.